UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
GREEN BAY DIVISION

CAROLYN J. O'LEARY, individually
and on behalf of all other similarly
situated individuals,

    Plaintiff,

v.                                                Case No. 1:17-cv-01774-WCG

HUMANA INSURANCE COMPANY and
HUMANA INC.,

    Defendants

---

**MEMORANDUM IN SUPPORT OF
PLAINTIFFS' THIRD MOTION TO COMPEL DISCOVERY FROM
DEFENDANTS HUMANA INSURANCE COMPANY AND HUMANA INC.**

Table of Contents

| | | | |
|---|---|---|---|
| I. | | Background | 3 |
| II. | | The Requested Documents Are Relevant to the Crucial Issue of Which Damages Methodology Applies | 4 |
| | A. | The determination of the proper damages methodology affects damages by 70% or more. | 4 |
| | B. | Documents about extra compensation and deductions to salary are related to an evidentiary dispute about the application of the FWW method. | 5 |
| | | 1. The requested documents are relevant to the factual dispute regarding whether all payments labeled "On Call Pay(ments)" are for "on call" work. | 9 |
| | | 2. Humana's proffered answer for "Unpaid Other" deductions is ambiguous; the requested documents are therefore not only relevant, but necessary. | 11 |
| III. | | If Humana Has No Responsive Documents, then it Must Provide Full Answers to Interrogatory No. 17 | 12 |
| IV. | | Conclusion | 12 |

## I. Background

Plaintiffs issued a discovery request on April 29, 2019,[1] which consisted of a single interrogatory, a single document request and 10 requests for admission. (*See* Ex. 1 attached to July 30, 2019 Eberle Decl.[2])

In its May 29, 2019 response, Humana failed to substantively respond to 5 of the 12 discovery requests. (Ex. 2.) Plaintiffs sent a deficiency letter on June 24, 2019 outlining the requests that still needed to be answered. (Ex. 3.) The parties met and conferred on June 26, 2019, and Humana's counsel stated that he would consult his client about supplementing its production. (Ex. 4, June 27, 2019 email from Eberle to Coleman.) Having heard nothing, a week-and-half later on July 7, 2019, Plaintiffs' counsel again wrote to Humana. (Ex. 5, July 7, 2019 email from Eberle to Coleman.) Finally, on July 10, 2019, Humana supplemented some of its responses. (Ex. 6.)

With regard to the sole document request, Document Request No. 40, Humana produced a one-page document it *created* for this litigation, *see* Ex. 6 at 4 & attached document Bates No. 1547, and apparently is standing on its objections to producing documents that were created in the regular course of business. Plaintiffs' counsel followed up on this response—"[I]s it Humana's position that it has produced all documents responsive to Document Request No. 40?" (*See* Ex. 7, July 12, 2019 email from Eberle to Coleman.) Humana did not respond.

Plaintiffs are entitled to all documents responsive to Document Request No. 40.

---

[1] Plaintiffs' Fifth Set of Interrogatories, Fifth Set of Requests to Produce Documents, and Third Set of Requests for Admission.
[2] Unless otherwise noted, subsequent references to exhibits are to the exhibits attached to the July 29, 2019 Declaration of Betty Eberle.

## II. The Requested Documents Are Relevant to the Crucial Issue of Which Damages Methodology Applies.

Document Request No. 40 asks for documents that "describe and/or explain Humana's use of" a set of "Earnings Element" codes found in the payroll data Humana produced for the Collective Members. These codes relate to instances of "extra compensation" paid to Collective Members and to deductions made to their salaries for certain absences. These payments/deductions are relevant to the crucial issue of the proper damages methodology to apply—the default methodology or the Fluctuating Workweek (FWW) methodology.

As discussed in previous discovery motions, the "employee's regular rate of pay is a factual matter." *Urnikis-Negro v. Am. Family Prop. Servs.*, 616 F.3d 665, 680 (7th Cir. 2010). The "regular rate of pay" analysis is extremely significant, not only because the rate is used in the damages equation, but because the same analysis determines whether the default 1.5 multiplier or a 0.5 multiplier is used. (*See e.g.*, Dkt No. 104 at 3; Dkt. No. 121 at 2.)

Even assuming average overtime of just 4 hours a week, the determination of this issue will affect the damages amount by 70%. Given the significance of this issue, Plaintiffs are entitled to documents that describe/explain these codes and there is no excuse for Humana refusing to produce responsive documents.

### A. The determination of the proper damages methodology affects damages by 70% or more.

One only need look at the math to establish that the determination of the proper damages methodology affects damages by 70% or more (when the weekly-average number of overtime hours is at least 4 hours). As shown in the equation below, when the divisor for calculating the "regular rate of pay" is changed from the default 40 hours to 44 hours, and the overtime multiplier is changed from the default 1.5 to 0.5, the resulting amount will be reduced by 70%:

Default Method:

$$\frac{Weekly\ Salary}{40\ hours} \times 1.5 = 0.0375 \times Weekly\ Salary$$

FWW Method:

$$\frac{Weekly\ Salary}{44\ hours} \times 0.5 = 0.0114 \times Weekly\ Salary$$

As a matter of math, using 0.0114 instead of 0.0375 in the damages equation produces a 70% reduction in damages—regardless of the weekly salary and the *total* number of overtime hours at issue.

Although Plaintiffs do not yet have final numbers, Plaintiffs use the following ballpark numbers to illustrate the effect of using the different damages methods. There are approximately 200 class members, and the average weekly salary is approximately $1,400. Assuming that the average weekly overtime amount is 6 hours per week, and that the average number of weeks that Class Members worked during the relevant time period is 99 weeks (1.9 years), the approximate resulting damages, including liquidated damages, are:

| | |
|---|---|
| Default method: | $12.4 million |
| FWW method: | $3.6 million |

In this example, where the average weekly overtime hours are 6 hours, using the FWW method instead of the default method results in a 71% reduction in damages. Humana cannot dismiss this issue as insignificant.

### B. Documents about extra compensation and deductions to salary are related to an evidentiary dispute about the application of the FWW method.

Humana wants to rebut the presumption—that the "regular rate of pay" is calculated by dividing the weekly salary by 40 hours and a 1.5 multipler is used for overtime hours—by attempting to establish that Humana and the employees have "in fact agreed that a fixed weekly

salary will constitute payment at the regular rate for any and all hours worked." *Urnikis-Negro v. Am. Family Prop. Servs.*, 616 F.3d 665, 680 (7th Cir. 2010).

The evidence in the record thus far, however, indicates that Humana had a policy of paying UM nurses, including the Collective Members, "extra compensation" in addition to their "fixed weekly salary" for working specific hours, and for making deductions to their "fixed weekly salary" for certain absences. Under these circumstances, the "fixed weekly salary" would *not* "constitute payment at the regular rate for *any and all* hours worked," and thus the FWW method would not apply. *See* 616 F.3d at 680 (emphasis added). *See also See O'Brien v. Town of Agawam*, 350 F.3d 279 (1st Cir. 2003) (additional compensation for working certain hours meant the officers did not receive a fixed salary for whatever hours they were called upon to work in a workweek, and therefore, the FWW did not apply); *Hunter v. Sprint Corp.*, 453 F. Supp. 2d 44, 60 (D.D.C. 2006) ("The unavoidable implication of this policy is that an employee who had exhausted his leave bank (or not accrued sufficient leave time) would have been docked by Sprint for such missed time. That is precisely the sort of arrangement that the Department of Labor has found to be inconsistent with use of the FWW method.").[3]

Evidence of these extra payments and deductions are found in the payroll data that Humana produced and each instance has an "Earnings Element" code associated with it. To

---

[3] *See also Caraballo v. City of Chicago*, 969 F. Supp. 2d 1008, 1021 (N.D. Ill. 2013) ("[A]s in *O'Brien*, … paramedics can earn shift-differential payments in the form of Acting Pay or Driving Pay or both, during a pay period. Consequently, … the FWW method is not appropriate for calculating the paramedics' overtime."); *Young Chul Kim v. Capital Dental Tech. Lab., Inc.*, 279 F. Supp. 3d 765, 774 (N.D. Ill. 2017) (evidence of extra pay "for work … performed on Saturdays" defeated employer's FWW summary judgment motion); *Brumley v. Camin Cargo Control, Inc.*, No. CIVA 08-1798 (JLL), 2010 WL 1644066, at *4-*5 (D.N.J. Apr. 22, 2010) ("Defendant concedes that on at least one occasion, it docked a Plaintiff inspector's fixed salary for an impermissible reason. [] Although it characterizes such an event as statistically insignificant, such an argument goes to weight. This Court, therefore, denies summary judgment to Defendants on the issue of whether they complied with the FWW method of paying the Plaintiff inspectors.").

understand the payroll data and obtain admissible evidence on this issue, Plaintiffs asked Humana in Interrogatory No. 17 to "define … and *explain* Humana's *policy* for using" eleven particular "Earnings Element" codes that were listed in the payroll data of Collective Members. (Ex. 1 at 2) (emphasis added). Humana responded with abbreviated answers:

> **Weekend** – compensation paid to associates for working a weekend schedule.
> **On Call Pay** – compensation paid for being on-call.
> **On Call Payments** – compensation paid for Friday, weekend, holiday, and daily on call status.
> **One time payment** – supplemental lump sum payment for merit increase with special tax withholding.
> **Bonus Pay** – miscellaneous bonus payments.
> **PTO Med** – paid PTO hours to supplement short term disability and FMLA.
> **Time Entry Wages** – for non-exempt associates this represents earnings calculated by an hourly rate of pay multiplied by hours worked; for exempt associates this represents an earnings code used to correct or adjust a prior error in payroll.
> **Unavail PTO** – unavailable PTO hours when PTO hours are entered, but PTO balance is not sufficient to cover PTO hours entered.
> **PTO Unscheduled** – paid time off benefit that was not scheduled in advance.
> **Unpaid Med** – unpaid time entered for FMLA leave.
> **Unpaid Other** – unpaid leave for other than FMLA or Workers Compensation.

(Ex. 2 at 4–5.)

These abbreviated answers do not "explain" Humana's "policy" regarding the Earnings Element codes, and thus are inadequate and leave Plaintiffs with many unanswered questions. However, Plaintiffs also requested associated documents. In Document Request No. 40, Plaintiffs asked Humana to produce documents that "describe and/or explain Humana's use of" the Earnings Element codes:

> **[Document Request] 40.** Non-duplicative documents that describe and/or explain Humana's use of any "Earnings Element" codes listed in Interrogatory Number 17.

(Ex. 1 at 2.) Humana responded with predominately boilerplate objections, which have no effect[4]:

> **RESPONSE:** Defendants object to this request on the grounds it is vague and ambiguous and the subject codes are defined and explained in Interrogatory No. 17. Defendants further object to this request on the grounds that it is overly broad and unduly burdensome, confusing, vague, and fails to identify what documents are being sought, or place any limits as to scope. Subject to the foregoing objections and without waiving the same, Defendants direct Plaintiffs to all the payroll records previously produced for each Collective Member.

(Ex. 2 at 5–6.). The only *non*-boilerplate objections Humana made were that "the subject codes are defined and explained in Interrogatory No. 17," and that the request "fails to … place any limits as to scope." As to the latter objection, the request *is* limited in scope; the General Instructions state: "Each request listed below is intended to cover the time period December 20, 2014 to March 3, 2018, unless otherwise noted." (Ex. 1 at 2.)

The other non-boilerplate objection—that the "codes are defined and explained in Interrogatory No. 17"—is not a legitimate objection. Plaintiffs are entitled to documents regarding these Earnings Element codes to both provide clarification to the abbreviated interrogatory answers that Humana gave and to *test* the accuracy of those answers.

Plaintiffs discuss below just two examples demonstrating that the requested documents are not only relevant and proportional to the needs of the case (which is all that is required), but also *necessary* for an accurate understanding of the facts in this case.

---

[4] Boilerplate objections do not meet a party's burden to "show with specificity that the request is improper." *Murillo v. Kohl's Corp.*, No. 16-CV-196-JPS, 2016 WL 4705550, at *3 (E.D. Wis. Sept. 8, 2016) (quotations omitted) ("An objecting party must show with specificity that the request is improper.")

### 1. The requested documents are relevant to the factual dispute regarding whether all payments labeled "On Call Pay(ments)" are for "on call" work.

In response to Interrogatory No. 17, Humana states that its "policy" with regard to using the "On Call Pay" element was "compensation paid for being on-call," and with regard to using the "On Call Payments" element was "compensation paid for Friday, weekend, holiday, and daily on call status." But neither of Humana's explanations for the codes jibes with the evidence in the case, which shows that Humana often used the "On Call Pay(ments)"[5] element for work that is *in no way* "on call." Class members testified that there were various arrangements for earning extra compensation—some were for doing on-call work and some were for working particular hours, *not* on-call. *See, e.g.*, Dkt. No. 105-9, Hartnell Dep., May 17, 2019, at 57:21–58:9 ("Q: … [W]ere those offers of extra compensation for being on call in case work came in or was it for actually working?  A: They had two separate offers …. [T]hey had scheduled nurses that got the per diem rate that worked a set number of hours. And then they also had a set on-call nurse that volunteered that got a certain amount for being on call, and if they got called in, then they earned more").[6]

The evidence shows, however, that Humana used the "On Call Pay(ments)" code for both of these situations—*i.e.*, both for on-call work and for working a set number of hours at a particular time:

---

[5] The answers regarding the two codes are virtually identical and Humana's 30(b)(6) deponents were unable to explain when the "On Call Pay" code was used versus the "On Call Payments" code. (*See* Ex. 8, Harrington Dep., Mar. 11, 2019, at 162:19–163:18; Ex. 9, Coyle Dep., Feb. 19, 2019, at 140:21–141:9.)  Therefore, Plaintiffs refer to the "On Call Pay" and "On Call Payments" codes collectively as "On Call Pay(ments)."

[6] *See also* Ex. 10, Crows-Skaggs Dep., June 5, 2019, at 54:17–55:19; Ex. 11, Decker Dep., May 22, 2019, at 72:10–73:10.

9

> Q: And you also talked about working on the weekend and getting paid for -- paid extra for that and that that was called on-call pay?
>
> A: That's how it was listed on my paycheck.
>
> Q: Why was it called on-call pay?
>
> A: I don't know. When it was presented in the meeting it was not called on call. It was called weekend work lump-sum payment for hours worked.
>
> Q: Was there anything on call about the nature of the work?
>
> A: No, we were expected to be at our computers as if it were in -- as if it were a regular workday, 8 -- 8 to 5.

(Ex. 12, Stewart Dep., May 30, 2019, at 74:6–18.) The payroll records produced by Humana confirm that the extra compensation paid to Ms. Stewart for work that was *not* "on call" work, *see id.*, was identified in the payroll data with the "On Call Pay(ments)" Earnings Element code. (*See* Ex. 13, Extra Compensation Paid to Sharon Stewart from Payroll Data Produced by Humana.)

This discrepancy in Humana's use of the "On Call Pay(ments)" element is important given Humana's position that extra compensation for "on call" work does not qualify as "compensation in excess of [a Collective Members'] regular salary for performing work at particular times or for particular lengths of time." (*See* Dkt. No. 104 at 4–7; Dkt. No. 121 at 2–4.) In a previous interrogatory answer, Humana stated:

> [T]here were *no circumstances* prior to [reclassification to hourly], under which Defendants paid any Collective Member compensation in excess of his or her regular salary for performing work at particular times or for particular lengths of time, *other than one Collective Member* whose *regular* shift included one or more weekend days and therefore she was paid extra compensation on top of her salary when she worked her regularly-scheduled hours on a Saturday or Sunday.

(Dkt. No. 105-7 at 5) (emphasis added). (The "one" exception Humana refers to in its answer is a Class Member who received a shift-differential because her regular shift included a Weekend day. The "Earnings Element" in the Humana payroll data associated with this type of extra compensation is "Weekend.")

Humana goes on to state that "on-call pay for volunteering to be on an on-call status on a weekend" does *not* constitute "compensation in excess of his or her regular salary for performing work at particular times or for particular lengths of time":

> Although no payments [were] made for performing work at particular times or for performing work of particular lengths of time, there were infrequent instances prior to [reclassification of UM nurses to hourly] where some Collective Members were paid on-call pay for volunteering to be on an on-call status on a weekend.

*(Id.* at 6.) Humana has apparently taken the position that extra payments for "on call" work do not qualify as "extra compensation" in determining whether UM nurses' fixed weekly salary was supposed to constitute payment at the regular rate "for any and all hours worked." *Urnikis-Negro v. Am. Family Prop. Servs.*, 616 F.3d 665, 680 (7th Cir. 2010).

While it is premature to resolve the *legal* dispute about the status of extra payments for on-call work, Plaintiffs are entitled to all available evidence—including the responsive documents—to support its position on the *factual* dispute: that not all payments labeled "On Call Pay(ments)" are "compensation paid for being on-call," as Humana states in its answer to Interrogatory No. 17.

### 2. Humana's proffered answer for "Unpaid Other" deductions is ambiguous; the requested documents are therefore not only relevant, but necessary.

In its answer to Interrogatory No. 17, Humana asserts that its policy for the use of the Earnings Element code "Unpaid Other" is "unpaid leave for other than FMLA or Workers Compensation." (Ex. 2 at 5.) However, Humana does not explain how that is different than, for example, "Unavail PTO," which is also unpaid leave for reasons other than FMLA or Workers Compensation. (*See id.*) Since *certain* deductions for absences are "inconsistent with use of the FWW method," *Hunter v. Sprint Corp.*, 453 F. Supp. 2d 44, 60 (D.D.C. 2006), an explanation of

the Earnings Element codes Humana used to label the deductions is relevant to whether the FWW applies.

### III. If Humana Has No Responsive Documents, then it Must Provide Full Answers to Interrogatory No. 17.

Given that Humana operates a nationwide company with over 40,000 employees,[7] it would not be credible that Humana has no responsive documents that were created in the regular course of business explaining the Earnings Element codes—*e.g.*, no documents, emails, or manuals that explain to the managers across the country how to use the various Earnings Element codes for the extra compensation/deductions for the employees under their supervision. Despite this, Humana is standing on its objections and produced only a one-page document that it *created* for this litigation that simply reflects the answers to Interrogatory No. 17. (*See* Ex. 6 at 4 & attached document Bates No. 1547.) Humana has produced no responsive documents that were created in the regular course of business.

In the unlikely event that Humana has no responsive documents that were created in the regular course of business, then it must provide *full* answers to Interrogatory No. 17—*i.e.*, answers that "*explain* Humana's *policy* for using" the "Earnings Element" codes. The shorthand definitions Humana has given do not fairly and adequately answer the interrogatory.

Given the significance of the issue of whether the FWW method applies, Plaintiffs are entitled to responses that are full and complete.

### IV. Conclusion

As Plaintiffs have set forth in previous motions, "once relevance has been shown, it is the objecting party's obligation 'to show why a particular discovery request is improper.'" *Varelas v. Crown Equip. Corp.*, No. 17-CV-869-JPS-JPS, 2018 WL 1307961, at *1 (E.D. Wis. Mar. 13, 2018)

---

[7] *See* Dkt. No. 70-1 at 16.

(*quoting Sandoval v. Bridge Terminal Trans., Inc*., No. 14–CV–639, 2015 WL 3650644, at *1 (E.D. Wis. June 10, 2015)). Plaintiffs have shown that the requested documents are relevant. Because Humana has not met its burden to show the request is improper, the Court should order Humana to fully respond to the document request. If Humana has no responsive documents that were created in the regular course of business, then it must provide full answers to Interrogatory No. 17, as its current answers do not fairly and adequately answer the interrogatory.

Dated this 30th day of July, 2019.

s/ Elizabeth J. Eberle
Elizabeth J. Eberle, WI State Bar #1037016
MINER, BARNHILL & GALLAND, P.C.
44 E. Mifflin St., Suite 803
Madison, WI  53703
(608) 255-5200 (Telephone)
(608) 255-5380 (Facsimile)
beberle@lawmbg.com
**Attorney for Plaintiff and Collective Members**
