UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

CAROLYN J. O'LEARY, individually and
on behalf of all others similarly situated,

        Plaintiffs,

      v.                                           Case No. 17-C-1774

HUMANA INSURANCE COMPANY, et al.,

        Defendants.

---

### DECISION AND ORDER DENYING MOTION TO DECERTIFY

---

Plaintiff Carolyn J. O'Leary, individually and on behalf of all others similarly situated, commenced this action under the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* (FLSA), against Defendants Humana Insurance Company and Humana Inc. (collectively, Humana) on December 20, 2017. On June 14, 2018, the court approved the parties' stipulation to conditionally certify this collective action. Dkt. No. 23. This matter comes before the court on Humana's motion to decertify. For the following reasons, the motion will be denied.

### BACKGROUND

Plaintiffs allege that Humana operated a willful scheme to deprive its clinical nurse advisors and other similarly-situated employees of overtime compensation by classifying them as exempt under the FLSA and paying them a straight salary with no overtime. On June 12, 2018, the parties stipulated to conditionally certify a collective action pursuant to Section 16(b) of the FLSA. Dkt. No. 22. The court approved the stipulation and ordered that a collective action be conditionally certified under 29 U.S.C. § 216(b) to include:

> All persons who were classified as exempt under the FLSA and worked as clinical nurse advisors for Defendants in the roles of Clinical Intake, Clinical Claims Review, Clinical Claims Review—DME, Acute Case Managers, or Market

> Clinical—Senior Products utilization management nurses, at any time within the
> three years prior to the date the Court approves this Stipulation.

Dkt. No. 23.

In its motion to decertify the conditionally-certified collective action, Humana describes the job duties of the five categories of employees identified in the collective action: (1) Acute Case Mangers, (2) Clinical Intake Nurses, (3) Market Clinical Senior Products Nurses (which Humana further divides into Home Health Team Nurses, On-Site Nurses, and Telephonic Review Nurses), (4) Clinical Claims Review Nurses, and (5) Clinical Claims Review–DME Nurses. Acute Case Managers provide "guidance along the healthcare continuum" by identifying the healthcare resources "most consistent" with the needs of Humana's members, including deciding whether to approve admission or a stay at a healthcare facility. Dkt. No. 203 at 3. Clinical Intake Nurses review clinical data to determine whether requested services are covered by a member's plan and identify the healthcare resources "most consistent" with a member's policy and needs. *Id.* at 5.

Humana asserts that Market Clinical Senior Products Nurses can be further separated into three categories: Home Health Team Nurses, On-Site Nurses, and Telephonic Review Nurses. Home Health Team Nurses use guidelines to decide if a member is authorized for home health care visits. *Id*. at 6. On-Site Nurses work from their home offices but also meet in-person with patients at facilities to assess patient needs and develop post-discharge plans. *Id*. at 6–7. Telephonic Review Nurses review pending cases, perform concurrent reviews, and are tasked with follow-up reviews to assess patient progress and discharge plans. *Id*. at 7.

Clinical Claims Review Nurses use their clinical knowledge to complete case reviews to evaluate services using medical records of procedures that already occurred. They also perform PPO reviews to determine whether certain outpatient procedures, like physical therapy and x-rays, are covered under Humana's Medicare supplement. *Id*. at 7–8. Nurses in the Clinical Claims

2

Review–DME (Durable Medical Equipment) category review requests for durable medical equipment, using their clinical experience and nursing knowledge to do so. *Id*. at 9.

## LEGAL STANDARD

The FLSA permits collective actions "against any employer . . . by any one or more employees for and on behalf of himself or themselves and other employees similarly situated." 29 U.S.C. § 216(b). Employees or former employees must give their consent in writing to become a party to a collective action brought pursuant to § 216(b). Therefore, unlike a typical class action suit under Rule 23, where unwilling parties must "opt out" of the class, the FLSA requires employees to "opt in" to the class. *Woods v. N.Y. Life Ins. Co.*, 686 F.2d 578, 579–80 (7th Cir. 1982).

The second step in an FLSA collective action—generally upon a defendant's motion for decertification—involves determining whether plaintiffs who have opted into the lawsuit are, in fact, similarly situated. *Brabazon v. Aurora Health Care, Inc.*, No. 10-C-714, 2011 WL 1131097, at *2 (E.D. Wis. Mar. 28, 2011). At this stage, the court assesses whether continuing as a collective action will provide efficient resolution in one proceeding of common issues of law and fact. *See Hoffmann-La Roche v. Sperling*, 493 U.S. 165, 170 (1989). On a motion to decertify the conditional collective action, the plaintiff retains the burden of demonstrating that certification is appropriate. *Ellis v. Elgin Riverboat Resort*, 217 F.R.D. 415, 419 (N.D. Ill. 2003); *see also Long v. Epic Sys. Corp.*, No. 15-CV-81-BBC, 2016 WL 4625497, at *4 (W.D. Wis. Sept. 6, 2016) (citation omitted). In determining whether parties are "similarly situated," the court considers certain factors, including (1) any disparate factual and employment settings of the individual plaintiffs, (2) the various individualized defenses available to the defendant, and (3) fairness and procedural considerations. *Thiessen v. Gen. Elec. Capital Corp.*, 267 F.3d 1095, 1102–03 (10th

3

Cir. 2001) (cited approvingly in *Espenscheid v. DirectStat USA, LLC*, 705 F.3d 770, 771–72 (7th Cir. 2013)).

## ANALYSIS

**A. Factual and Employment Settings of the Individual Plaintiffs**

Humana argues that the disparate factual and employment settings among Plaintiffs require decertification. It asserts that the five different roles that Plaintiffs could hold in its organization had disparate tasks, duties, productivity standards, and qualifications, among other criteria, that distinguish Plaintiffs. Humana claims that, because the factual and employment settings are disparate, they would be required to examine each of the over 200 Plaintiffs as witnesses at trial.

Plaintiffs submit they have met their burden to retain certification of the collective action. They argue that Plaintiffs were all Clinical Nurse Advisors (also referred to as Clinical Advisors) who shared the same primary job in utilization management (UM Nurses) and were classified as exempt under the FLSA. Dkt. No. 211 at 6. Plaintiffs dispute that the five categories Humana identified for the UM Nurses are factually disparate for purposes of proceeding as a collective action. Plaintiffs argue that the descriptions rely on Humana's own outdated job descriptions and, essentially, all describe similar utilization management tasks that these employees performed. They contend that all of the UM Nurses followed the "same core steps" in their work irrespective of the various job titles. *Id*. at 8. Plaintiffs outline the steps the UM Nurses perform in sequential order, summarized as follows: (1) Humana receives an insurance coverage request from a provider for a patient Humana insures, which is entered as a new case in Humana's computer system; (2) a UM Nurse selects the case from a queue of pending cases, determines if it includes the relevant information required by the guidelines for the requested service, and, if not, contacts the healthcare provider; (3) when all relevant information is collected, the UM Nurse determines if the request is

4

covered by the relevant guidelines; and (4) the UM Nurse then decides whether the benefit request is to be denied (if clearly outside the plan), approved, or referred for further review. *Id*. at 8–9.

Plaintiffs argue that all of the UM Nurses primarily performed these same core steps no matter which department they worked in. They contend that assignment of a case across the various job categories Humana identifies primarily depended on when the request was made (before or after the service) and what type of service and insurance coverage request was made (e.g., whether for durable medical equipment, commercial insurance products, or Medicare products). *Id.* at 10–12. In Plaintiffs' view, these common steps unite their work and any factual differences in their roles are not so great as to require decertification. Plaintiffs also contend the similar payroll practices, shift hours, managerial structure, and other employment handbook practices that applied to all of the UM Nurses supports Plaintiffs' argument that they are substantially similar for purposes of evaluating the motion to decertify the collective action. *Id*. at 6–7.

Humana disputes that Plaintiffs can meet their burden to show that the UM Nurses comprising the collective class are substantially similar, setting forth a series of disparate facts. First, Humana argues that Plaintiffs' salaries, "generally ranging from $44,385.31 to $86,526.27," require the collective action to be decertified. Dkt. No. 203 at 12. It asserts that the wide variance in salaries means that each Plaintiff's salary must be individually considered to determine exemption status. True, there is some variance in Plaintiffs' salaries, but the range in salaries alone does not suggest Plaintiffs' job duties vary so greatly that Plaintiffs cannot form a single collective class.

Next, although Plaintiffs assert that Humana has admitted that its UM Nurses operate under a "common" policy with common goals through its "Human Associates Work-Life Polices & Processes," which each Plaintiff acknowledged receiving, *see* Dkt. No. 174 at 4, Humana contends

5

that Plaintiffs used different clinical guidelines that preclude them from forming a collective class. For example, some of the UM nurses used Medicare guidelines while others used Milliman and LCD guidelines. Dkt. No. 203 at 13. Humana also notes that some of the UM Nurse categories used "different criteria" from the others and some Plaintiffs used different computer systems. *Id*. Humana insists these varying guidelines require testimony from the over 200 party-Plaintiffs at trial in order to show that the Administrative Exemption or the Learned Professional Exemption apply. But Humana has already identified five roles that the UM Nurses held in its organization. And it is not convincing that these guidelines caused UM Nurses within these categories to operate so dissimilarly from others that their primary role in utilization management—and the "core steps" that Plaintiffs identify—cannot be evaluated. Surely over 200 witnesses are not required to set forth what impact a handful of different guidelines or computer systems had across these five representative job categories identified by Humana.

Humana also argues that the geographic disparity of Plaintiffs and their different managers demands decertification or else the court will need at least 200 "mini-trials" to determine how managers directed nurses to use their discretion and independent judgment. One UM Nurse, for example, had 20 managers. *Id.* at 15. But these facts do not necessarily support decertification. Having 20 managers can suggest Plaintiffs were rather interchangeable in their roles as much as it suggests variance. And Humana does not persuasively explain why the location of Plaintiffs— spread across 31 states—makes a significant difference in this case, particularly if some Plaintiffs were performing reviews remotely. As one Plaintiff explained, she performed reviews originating from "most of the United States" and was not confined to a specific region. Dkt. No. 203-11 at 36:17–24.

Humana's own descriptions of the job categories in its brief also fail to articulate material differences to support its motion to decertify. For example, Telephonic Review Nurses, who the

6

court presumes conducted their job by telephone, seem to do the same job as On-Site Nurses, except remotely. Almost two pages of Humana's brief are devoted to describing the role of Clinical Claims Review Nurses, but they seem to perform largely the same job as Clinical Intake Nurses (except Clinical Intake Nurses focus on outpatient procedures and Clinical Claims Review Nurses focus on inpatient procedures, Medicare PPO reviews, and HMO cases), who perform largely the same job as Clinical Claims Review–DME Nurses (except they focus on requests for durable medical equipment). Humana states that all new Clinical Intake Nurses were expected to have RN licenses and three years of clinical experience, yet for other categories, e.g., Market Clinical Senior Products or Clinical Claims Review–DME Nurses, Humana provides no indication of the expected experience, education, or licensing requirements, if any. These descriptions do not overcome the evidence and arguments Plaintiffs have submitted to show their roles are substantially similar for purposes of certification of a collective action.

This conclusion is reinforced by Humana's own personnel. In addition to the deposition testimony cited by Plaintiffs, Humana's Compensation–HR Leader Amber Coyle declared that the same five job categories Humana identifies in its motion for decertification all performed utilization management as a "primary" job duty and other than these five categories of clinical nurse advisors "there are no other nurses employed by Humana whose primary job duties include Utilization Management." Dkt. No. 70-14 at 3; Dkt. No. 212-5 at 43:2–5. Plaintiffs, citing *Long*, 2016 WL 4625497, posit that the essential question is whether Plaintiff's "primary job duties and defendant's practices and process that applied" to them are materially uniform so that Plaintiffs' collective action should remain certified. *Id.* at *1. The court agrees that asking whether Plaintiffs are similarly situated at this point involves assessing their *primary* job duty, not the immaterial nuances that might differentiate Plaintiffs within the five categories Humana identifies. At this stage, Humana has not shown that the material factual differences among Plaintiffs are so great

7

that the collective action should be decertified. Nor has it overcome the evidence Plaintiffs have provided to argue that the collective members performed a similar utilization management task to review whether medical requests were covered under an insured's plan using the applicable guidelines. Accordingly, Plaintiffs' factual circumstances do not require decertification.

**B. Individualized Defenses Available to Defendants**

Humana also argues that its assertion of individualized defenses regarding liability as to each Plaintiff requires decertification. Humana says it will assert both the Learned Professional Exemption and the Administrative Exemption at trial. Humana argues that decertification is necessary for it to raise the individualized defenses specific to each Plaintiff.

To qualify for the Learned Professional Exemption, (1) the employee's primary duty must be the performance of work requiring advanced knowledge; (2) the advanced knowledge must be in a field of science or learning; and (3) the advanced knowledge must be customarily acquired by a prolonged course of specialized intellectual instruction. 29 C.F.R. § 541.301(a). Registered nurses "generally meet the duties requirements for the learned professional exemption." § 541.301(e)(2). "Licensed practical nurses and other similar health care employees, however, generally do not qualify as exempt learned professionals because possession of a specialized advanced academic degree is not a standard prerequisite for entry into such occupations." *Id.*

To qualify for the Administrative Exemption, (1) the employee must meet the salary requirement; (2) the employee's primary duty must consist of the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and (3) the employee's primary duty must include the exercise of discretion and independent judgment with respect to matters of significance. 29 C.F.R. § 541.200(a). An employee's "primary duty" is "the principal, main, major or most important duty that the employee performs." § 541.700(a).

The parties devote much time to arguing whether the exemptions apply to Plaintiffs, but the real inquiry at this stage is whether the exemptions can be assessed on a collective-wide basis at trial. If Plaintiffs demonstrate that it is appropriate to resolve the exemption issue on a collective-wide basis, decertification would be unnecessary. *See Russell v. Ill. Bell Tel. Co.*, 721 F. Supp. 2d 804, 820 (N.D. Ill. 2010). With respect to the Learned Professional Exemption, Humana states that each Plaintiff meets the salary requirement of the exemption and notes that 185 Plaintiffs are RNs and 18 Plaintiffs are LPNs. Dkt. No. 203 at 16. It maintains that it "intends to argue that the 185 RN Plaintiffs fall squarely within the Learned Professional Exemption." *Id*. at 17. Humana has identified a relevant fact shared by a vast majority of Plaintiffs that it believes is key to this exemption, namely Plaintiffs' salaries. This shared fact illustrates the ease with which collective-wide arguments can be made in the present case. If Plaintiffs are factually similar in all material respects for purposes of certification such that Humana can argue this exemption on a collective-wide basis, decertification would hardly seem appropriate.

For the 18 LPNs, Humana says it intends to argue that, based on the relevant regulations, an "individual look" is required to assess their primary duty. *Id*. But it is not clear how the primary duties among the 18 LPNs are so dissimilar that testimony from each is required to determine whether this exemption applies to them. Humana adds that each LPN "is required to have at least three years of clinical experience, in addition to the educational and other certification requirements of an LPN." *Id*. at 18. Rather than showing that individualized defenses are required, this requirement shows that these Plaintiffs are substantially similar. It thus appears that the Learned Professional Exemption can be approached by evaluating a few questions that are common to the vast majority of Plaintiffs, thereby negating the need for Plaintiff-specific defenses and testimony from each Plaintiff.

9

Humana employs a similar argument to insist that individualized defenses are required to advance its Administrative Exemption defense. Humana's attempt to argue that every Plaintiff should qualify for this exemption suggests that Plaintiffs are in material ways factually similar for purposes of the exemption. For example, in arguing that Plaintiffs performed office work directly related to the management of Humana's business or its customers, Humana states:

> Clearly Plaintiffs' work was related to the servicing of Humana's insurance business; they held a vital role with regard to controlling approved medical procedures to those which were medically necessary for individual members, Plaintiffs were not *producing* Humana's product, they were assisting Humana with *managing* its product.

Dkt. No. 203 at 19 (emphasis in original). This undercuts Humana's argument that Plaintiffs are irreconcilably dissimilar by emphasizing the shared *primary* job function that all Plaintiffs held. Yet again it emerges that the UM Nurses performed the same ultimate task in whatever capacity: utilization management of Humana's insurance product. While certain aspects of Plaintiffs' jobs may have differed, the question is whether these differences are material and preclude collective-wide resolution.

Regarding the final prong of the Administrative Exemption (whether Plaintiffs exercised discretion and independent judgment on significant matters), Humana argues that the regulations require that each Plaintiff be individually analyzed to decide whether the exemption applies. The regulations set forth the relevant factors, which include:

> whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices; whether the employee carries out major assignments in conducting the operations of the business; whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business; whether the employee has authority to commit the employer in matters that have significant financial impact; whether the employee has authority to waive or deviate from established policies and procedures without prior approval; whether the employee has authority to negotiate and bind the company on significant matters; whether the employee provides consultation or expert advice to management; whether the employee is involved in planning long- or short-term business

> objectives; whether the employee investigates and resolves matters of significance on behalf of management; and whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances.

29 C.F.R. § 541.202(b). The court is not persuaded that Plaintiffs discharged any of the factors outlined by § 541.202(b) in ways that would materially differ across the five job categories Humana identified, let alone within them. Again, Humana presumes that Plaintiffs are different for purposes of these factors, but its own words and factual presentation of the job categories of Plaintiffs have shown that Plaintiffs' primary job function was utilization management. Given that Plaintiffs share this primary job function, Humana's argument that this exemption merits individual resolution, as opposed to a collective-wide evaluation, is unavailing.

Nothing about the specific factors Humana asserts are at issue demands testimony from each Plaintiff to establish whether the Learned Professional or Administrative Exemptions apply. Humana has already sorted Plaintiffs into five representative categories, suggesting that Plaintiffs are uniform enough to be placed into relatively few groups. It is not clear why—with these categories already identified—Humana cannot support its defenses at trial by examining representative witnesses. Having already found that the factual and employment settings of Plaintiffs are substantially similar for purposes of collective certification, the court is not persuaded that this conclusion is altered by the defenses Humana seeks to assert at trial. Again, whatever differences exist across these groups are not so great to preclude collective-wide resolution of Humana's defenses. Decertification is not required to assess the defenses with respect to these Plaintiffs.

## C. Calculation of Damages

Humana also contends that the collective action must be decertified because, if Humana is ultimately found to owe damages, any damages calculation will need to be individually computed. Humana asserts that Plaintiffs have no timekeeping records of their hours worked. In addition to

11

Plaintiffs working a different number of hours, Humana argues that, if Plaintiffs insist that a "clear mutual understanding" approach be used to calculate damages, Humana must be able to "examine" each Plaintiff on a case-by-case basis. Dkt. No. 203 at 23. Citing *Espenscheid v. DirectSat USA, LLC*, 705 F.3d 770 (7th Cir. 2013), Humana asserts that its "plaintiff-specific" arguments require decertification.

In *Espenscheid*, the Seventh Circuit affirmed the decertification of a collective action brought by 2,341 cable technicians seeking unpaid overtime compensation. The court noted that a class trial on damages would not be feasible because of the variance in the class members' damages. The court recognized that, because the technicians were compensated on a piece-rate system, some of the technicians may not have worked more than 40 hours in a week. "Variance would also result from different technicians' doing different tasks, since it's contended that the employer told them not to report time spent on some of those tasks, though—further complicating the problem of proof—some of them reported that time anyway." *Id.* at 773–74. In addition, the technicians had "no records of the amount of time they worked but didn't report on their time sheets" and would have had to reconstruct their unreported time "from memory, inferred from the particulars of the jobs the technicians did, or estimated in other ways." *Id.* at 774–75.

Plaintiffs dispute Humana's damages argument, both on the caselaw and the facts. To begin, Plaintiffs argue that, unlike *Espenscheid*, Humana actually possesses data about how much Plaintiffs worked, including phone and computer records. Dkt. No. 211 at 28. They contend that collective members were required to log into the Avaya phone system at the beginning of work and log out at the end. While Plaintiffs acknowledge that the Avaya phone system records are imperfect, due to the fact that members may have logged out at 5:00 p.m. but continued to work or forgot to log out at the end of the day, Plaintiffs argue they will supplement these records with

12

Humana's computer records. *Id*. at 27. In any event, the present motion for decertification is not the place for this issue of reliability to be resolved.

There is little doubt that how to calculate damages, if any, in this case will be vigorously contested. How much this weighs on this motion to decertify is less clear, particularly when Plaintiffs have already demonstrated that the collective class is substantially similar and shares common questions and that there is potentially representative data from which damages may be assessed. Other courts have not been persuaded that damages bear on the decision to decertify. *See Butler v. DirectSAT USA, LLC*, 47 F. Supp. 3d 300, 309 (D. Md. 2014) ("Moreover, the fact that Plaintiffs' damages calculations are more difficult because the technicians' hourly rates fluctuated due to the piece-rate system, is not by itself a reason to decertify a collective."); *Campbell v. City of Los Angeles*, 903 F.3d 1090, 1116 (9th Cir. 2018) ("Nor are individualized damages calculations inherently inconsistent with a collective action. . . . Individual damages amounts cannot defeat collective treatment under the more forgiving standard of section 216(b) either.").

At this stage, the court is not evaluating how damages are to be calculated or whether Plaintiffs have evidence that is representative for the collective class on this issue. Instead, the court considers whether Plaintiffs have shown it is possible to resolve this issue on a collective-wide basis. At this point, Humana's argument that damages calculations require a plaintiff-by-plaintiff approach in light of the other sources of evidence available to it and that decertification would make this process more efficient is unconvincing. Plaintiffs have demonstrated multiple sources of representative data exist that could be used to indicate what hours were worked. Plaintiffs have not asked the trial court "to embark on a shapeless, freewheeling trial that would combine liability and damages and would be virtually evidence-free so far as damages were

13

concerned." *Espenscheid*, 705 F.3d at 776.  Accordingly, the collective action will not be decertified on account of Humana's request to examine each Plaintiff at trial to evaluate damages.

Humana also contends that individual testimony may be needed to show whether there was a "clear mutual understanding" between Humana and Plaintiffs to calculate damages under the "half-time" method. Dkt. No. 203 at 23. The applicable Department of Labor regulation provides,

> Where there is a clear mutual understanding of the parties that the fixed salary is compensation (apart from overtime premiums) for the hours worked each workweek, whatever their number, rather than for working 40 hours or some other fixed weekly work period, such a salary arrangement is permitted by the Act if the amount of the salary is sufficient to provide compensation to the employee at a rate not less than the applicable minimum wage rate for every hour worked in those workweeks in which the number of hours he works is greatest, and if he receives extra compensation, in addition to such salary, for all overtime hours worked at a rate not less than one-half his regular rate of pay.

29 C.F.R. § 778.114(a).

Plaintiffs insist that Humana's own policies will show that such an understanding did not exist and that individualized testimony on this matter is neither appropriate nor warranted. Plaintiffs also contend that Humana has not described what testimony from Plaintiffs would provide that is not already available from Humana's own policies. The court agrees that Humana has not shown what testimony from over 200 Plaintiffs would demonstrate on this point that cannot be gleaned from representative testimony from the five categories of Plaintiffs Humana has already identified or from Humana's own policies. Decertification on these grounds therefore is not warranted.

### D. Fairness and Procedural Considerations

Lastly, on a motion to decertify, the court addresses any fairness and procedural considerations. When evaluating fairness and procedural concerns, the court considers whether "a collective action is an efficient and fair way to resolve the plaintiffs' claims." *Long*, 2016 WL 4625497, at *8 (citing *Alvarez v. City of Chicago*, 605 F.3d 445, 451 (7th Cir. 2010)). In doing

14

so, "[t]he court should consider that the primary objectives of a § 216(b) collective action are: (1) to lower costs to the plaintiffs through the pooling of resources; and (2) to limit the controversy to one proceeding which efficiently resolves common issues of law and fact that arose from the same alleged activity." *Moss v. Crawford & Co.*, 201 F.R.D. 398, 410 (W.D. Pa. 2000) (citing *Hoffmann-La Roche Inc.*, 493 U.S. at 170).

Humana asserts that it has a right to confront and cross-examine each party-Plaintiff regarding their work circumstances and hours worked. Given that Plaintiffs' factual circumstances are substantially similar in all material respects for purposes of proceeding as a collective action, resolving this lawsuit in one proceeding—rather than over 200 individual trials—is the most manageable and cost-effective path forward. This in no way precludes Humana from calling its own witnesses and cross-examining Plaintiffs' witnesses. Citing *Goldberg v. Kelly*, 397 U.S. 254 (1970), Humana argues that it has a due process right to examine each party-plaintiff. *Goldberg* did not address a collective action and instead dealt with the due process requirements that must be afforded before state public assistance benefits could be terminated.

The court does not find that retaining class certification deprives Humana of its right to present its case. A collective action under the FLSA, like a class action authorized by Federal Rule of Civil Procedure 23, is a specific litigation tool that exists to adjudicate common questions of law and fact arising from similarly-situated plaintiffs. Humana's attempt to put this device on trial is a red herring. Here, the issue is the certification of a collective action, and the court's decision to certify the collective action does not deprive Humana of presenting its own evidence and cross-examining witnesses at trial. Humana will have the same right to question witnesses as is available in any other collective or class action. Humana fails to explain what challenges it would face at trial that are different from any other defendant who would prefer a collective action not be

15

certified. Its due process concerns really amount to a challenge of the collective action device, which is not at issue here.

At this point, it is far from clear that testimony from each opt-in plaintiff on whatever recollection they may have of the number of hours they worked per day two or more years ago would be either necessary or helpful to determine damages. The mere possibility that some such testimony may be relevant and admissible is not enough to warrant decertification. Weighed against that possibility is the fact that a collective action could dispose of Plaintiffs' claims far more efficiently than addressing each employee claim individually in separate actions. The court is satisfied, at least at this point, that allowing the case to proceed as a collective action will not deprive Humana of its right to due process and procedural fairness. If, as the case proceeds, it appears that a collective action is unworkable or unfair, the court will reconsider its decision. As the record now stands, however, Plaintiffs have met their burden. Humana's motion for decertification is denied.

**E. Motions to Redact, Seal, and Restrict Documents**

The parties have filed several motions to restrict and redact certain documents filed in connection with Humana's motion for decertification. Dkt. Nos. 205–08, 213, and 220. For each of these motions, the parties have indicated that they are unopposed or that they conferred regarding filing the documents at issue prior to doing so. The parties have established good cause to restrict. Accordingly, the court will grant these motions.

## CONCLUSION

In sum, Plaintiffs have shown that the collective class of UM Nurses that the court conditionally certified should remain as an FLSA collective action. The court is not persuaded that, for purposes of assessing Humana's motion to decertify, Plaintiffs' primary job circumstances and duties are not similarly situated in all material respects. Given the substantial factual

similarities among Plaintiffs, Humana has not shown that the issues of damages or defenses cannot be resolved on a collective-wide basis.

**IT IS THEREFORE ORDERED** that Humana's motion to decertify the collective action (Dkt. No. 203) is **DENIED**.

**IT IS FURTHER ORDERED** that the parties' motions to restrict and/or redact documents and to file certain documents as restricted (Dkt. Nos. 205–08, 213 and 220) are **GRANTED**.

**IT IS FURTHER ORDERED** that Plaintiffs' motion for leave to file a sur-reply to Humana's motion to decertify the collective action (Dkt. No. 218) is **GRANTED**. The Clerk is directed to detach and e-file the sur-reply attached as Exhibit 1 to Dkt. No. 218.

Dated at Green Bay, Wisconsin this 30th day of November, 2020.

s/ William C. Griesbach
William C. Griesbach
United States District Judge